# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MUZZAFER S.M. TAHIR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09 C 6471 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| IMPORT ACQUISITION MOTORS, LLC; | ) | |
| LAMBORGHINI CHICAGO, INC.; | ) | |
| DOWNERS MOTORS, INC.; JOSEPH | ) | |
| ABBAS; MARK HOPPE; and | ) | |
| MK FUND, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Muzzaffer S.M. Tahir filed suit against defendants Import Acquisition Motors, LLC ("IAM"), Lamborghini Chicago, Inc. (n/k/a Fox Valley Motor Cars, LLC) ("Lamborghini Chicago"), Downers Motors, Inc. ("DMI"), Joseph Abbas, Mark Hoppe, and MK Fund, LLC ("MK Fund") (collectively, "the defendants") for breach of contract (Count I) and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("the Consumer Fraud Act"), 815 Ill. Comp. Stat. 505/2 (Count II).[1] The suit arises out of defendants' failure to deliver a car that Tahir purchased. Before the court are cross-motions for summary judgment. Tahir moves for summary judgment against defendants DMI, IAM, Hoppe, and MK Fund on Count I. (Dkt. 162.) Defendants Lamborghini Chicago, Hoppe, and MK Fund move for summary judgment in their favor on both counts, and defendant IAM moves for summary judgment in its favor on

---

[1] The court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity between Tahir and defendants. Tahir is an alien (Canadian citizen); IAM, Lamborghini Chicago, DMI, Abbas, Hoppe and MK Fund are Illinois citizens. Venue is proper under 28 U.S.C. § 1391(b) because defendants are residents of this district.

Count II. (Dkt. 165.) Tahir's motion is granted against DMI and denied against IAM, Hoppe, and MK Fund. Defendants' motion is granted in part and denied in part. Specifically, summary judgment is granted in favor of Lamborghini Chicago on both counts; denied with respect to Hoppe and MK Fund on both counts; and granted in favor of IAM on Count II.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). When considering cross-motions for summary judgment, the court must be careful to draw reasonable inferences in the correct direction. *See, e.g., Int'l Bhd. of Elec. Workers, Local 176* v. *Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is

factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323-24.

## BACKGROUND[2]

It is undisputed that well over four years ago Tahir paid more than $100,000 for a car that was never delivered. In response to Tahir's claim, defendants present a complex web of corporate entities and a considerable amount of finger pointing.[3]

In August 2009, the operation and management of the Bentley Gold Coast car dealership was in flux. Although defendant DMI[4] owned the dealership (and DMI was owned by Abbas) (dkt. 170 at 4, ¶ 15; *id.* at 6, ¶ 27), Abbas had signed an agreement with I-Hopp Motor Cars, LLC ("I-Hopp") to sell DMI.[5] (Dkt. 177 at 2, ¶ 6.) I-Hopp was formed by defendant Mark Hoppe for the purpose of purchasing DMI. (Dkt. 167 at 2, ¶ 6.) In order to ensure that DMI survived until the sale closed, Hoppe also formed defendant IAM[6] to manage and fund DMI. (Dkt. 177 at 2, ¶

---

[2] The facts set forth in this section are derived from the statements of fact submitted to the parties to the extent they comport with Local Rule 56.1. They are taken in the light most favorable to the non-movant. In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to the resolution of these motions.

[3] Based on the motions before it, the court will enter judgment against defendant DMI for outstanding amounts due to Tahir plus prejudgment interest. The court notes, however, that DMI has filed cross claims against the Hoppe defendants who appear to be ultimately responsible for Tahir's repayment. The court strongly suggests that Mr. Abbas and Mr. Hoppe engage in serious discussions regarding repayment of the amounts owing to Mr. Tahir and settlement of the remaining issues in this case without further expense to themselves or burden on this court.

[4] DMI also did business under the names Bentley Gold Coast and Bentley Downers Grove. (*Id.* at 2, ¶ 6.)

[5] The agreement also covered the sale of DMI's affiliate, Rush Motors, Inc. Although Rush is included in many of the transactions described in this section, it is not a named defendant in this case and the court will refer only to DMI in an attempt to focus on the facts relevant to the instant case.

[6] Hoppe is a manager and member of IAM. (Dkt. 175 at 2, ¶ 4.) IAM has done business under the names Bentley Gold Coast, Bentley Downers Grove, Lamborghini Gold Coast, Bentley Gold Coast, and Bugatti Chicago. (Dkt. 167, Ex, 3; Dkt. 175 at 2, ¶ 3.)

7.) Another company formed by Hoppe, MK Fund,[7] provided investment, management, and administrative services to IAM, I-Hopp, and Lamborghini Chicago, among other entities, during the relevant time period. (Dkt. 170 at 2, ¶ 3.) The court will refer to IAM, Lamborghini Chicago, Hoppe, and MK Fund collectively as "the Hoppe defendants" and to DMI and Abbas as "the DMI defendants."

On March 25, 2009, IAM and DMI entered into a Management Areement to memorialize IAM's management of DMI. (Dkt 170 at 3, ¶ 10; Dkt. 175 at 3, ¶ 10; Dkt. 177 at 3, ¶ 9.) The Management Agreement described the relationship between IAM and DMI as follows:

> At all times during the existence of this Agreement, [IAM] shall, insofar and while existing the powers and duties hereby conferred upon it, be considered an agent of [DMI] in the same manner as a person employed by [DMI] having like authority and duties, and every employee of [DMI], provided that any such person shall be employed upon the recommendation or approval of [IAM], shall be considered solely an employee of [DMI], but the cost of whose wages, compensation and other benefits of employment shall be the responsibility of [IAM].

(Dkt. 164, Ex. D ("Mgmt. Agmt."), § 11.) With respect to selling cars, the agreement provided,

> [IAM] is hereby authorized to supervise the sale and disposition of any new or used motor vehicles . . . on such terms and conditions as it deems reasonable and prudent in the ordinary course . . . and to contract for, and authorize the purchase on behalf of [DMI], such new . . . vehicles . . . as, in the reasonable business judgment of the Manager, shall be necessary for the operation of [DMI].

(*Id.*, § 4.)

While operating under the Management Agreement, IAM held an account in its name for the management of DMI ("the IAM/DMI account"). (*See* dkt. 170 at 4-5, ¶ 17; dkt. 175 at 4-5, ¶ 17.) IAM was entitled to "receive, collect and retain all income and receipts in excess of [DMI]'s cost of its goods and materials sold from [DMI]'s inventory of such items from and

---

[7] Hoppe and a business partner are the owners and managers of MK Fund. (Dkt. 175 at 2, ¶ 8; Dkt. 177 at 1, ¶ 2.)

4

after the date hereof during the term of this Agreement in the operation of [DMI's] businesses." (Mgmt. Agmt., § 9.) IAM was required to pay out of the IAM/DMI account "[a]ll operating expenses for goods and services incurred in the ordinary course of operation of [DMI's] business which accrue, are purchased or are incurred on and after the effective date of this Agreement, including, but not limited to, agreements and contracts for goods and services[.]" (*Id.*, § 9(B).) In addition, IAM ran credit card transactions for DMI through defendant Lamborghini Chicago's credit card machine.[8] (Dkt. 177 at 3, ¶¶ 10-11.) Lamborghini Chicago paid amounts charged through its credit card machine for DMI-related transactions to IAM. (*Id.*, ¶ 12.)

On August 4, 2009, Tahir visited the Bentley Gold Coast dealership, met with defendant Abbas, and executed a contract for the purchase of a 2008 Bentley Spur ("the Purchase Order").[9] (Dkt. 164, Ex. H ("Abbas Dep.") at 30; Dkt. 170 at 4, ¶¶ 12-13; Dkt. 175 at 3, ¶¶ 12-13.) The Purchase Order[10] identifies "Bentley Gold Coast dba Bugatti Chicago, dba Saleen Chicago, dba Saleen Midwest, dba Lamborghini Gold Coast, dba Luxury Motors Gold Coast, Inc." as the seller. (Dkt. 170 at 4, ¶ 14.) The Purchase Order appears to be "accepted by" Nicholas B. Litsos on behalf of the dealer.[11] (Dkt. 164, Ex. G.)

At the time Tahir signed the Purchase Order, the Bentley Gold Coast dealership did not own the car that Tahir purchased. Instead, it was located at and owned by Luxury Motors O'Hare, an unrelated dealership. (Dkt. 170 at 8, ¶ 6.) The expectation was that Tahir would pay

---

[8] Lamborghini Chicago is affiliated with Hoppe and it owned and operated a Lamborghini dealership in Westmont, Illinois during the relevant time period. (Dkt. 177 at 2, ¶ 5.)

[9] Defendants admit that Tahir was not aware of IAM's involvement in the operation of the dealership at the time. (Dkt 170 at 4, ¶¶ 18-19; Dkt. 175 at 5, ¶¶ 18-19.)

[10] The Purchase Order incorporates provisions on the reverse side of the order, but the parties have not provided the court with a copy of the reverse side. (*See* dkt. 164, ex. G.)

[11] The parties have not provided the court with any information about Litsos.

5

the Bentley Gold Coast dealership for the car and Bentley Gold Coast would then buy the car from Luxury Motors O'Hare and deliver the car to Tahir. (Abbas Dep. at 33:12-36:2, 51:8-52:3.) The day that Tahir signed the Purchase Order, he made a deposit of $20,000 using his credit card, payable to Lamborghini Chicago.[12] (Dkt. 170 at 4, ¶ 16; Dkt. 175 at 4, ¶ 16.) For the balance of the purchase price, Tahir made two wire transfers totaling $115,197 on August 4 and 10, 2009. (Dkt. 170 at 4-5, ¶ 17; Dkt. 175 at 5, ¶ 17.) Tahir's wire transfers were made from his Royal Bank of Canada account to the IAM/DMI account held by IAM. (Dkt. 170 at 7, ¶ 5; *id.*, Ex. 3.) It is undisputed that the DMI defendants never had access to the funds in the IAM/DMI account or otherwise received any money from Tahir. (*Id.* at 7, ¶ 5.)

On the day that Tahir made the final wire transfer, August 10, 2009, an individual with an email address indicating she worked for MK Fund wrote an email to two salesmen at the Bentley Gold Coast dealership stating that IAM would cut a check to Luxury Motors O'Hare to purchase Tahir's car.[13] (Dkt. 170 at 5, ¶ 21; Dkt. 164, Ex. I.) But the next day DMI terminated the Management Agreement. (Dkt. 167 at 3, ¶ 13; Dkt. 170 at 3, ¶ 11.) IAM never provided a check to buy the car from Luxury Motors O'Hare and the car was never purchased. (*Id.* at 8, ¶ 8.)

On August 11, 2009, Hoppe's deal to buy DMI apparently fell through. On the same day, IAM, whose sole purpose had been to fund and manage DMI, transferred funds out of the IAM/DMI account to several creditors, including a $100,000 transfer for legal services, a

---

[12] Tahir later reversed this payment and he received a credit on his card for the full $20,000. (Dkt. 177 at 4, ¶ 17.)

[13] The Hoppe defendants object to Tahir's use of this email on hearsay grounds. (Dkt. 175 at ¶ 21.) The statements are not being offered to prove the truth of the matter asserted, however, and therefore are not hearsay. Fed. R. Evid. 801(c)(2); *see also Barnes* v. *City of Harvey*, No. 98 C 3316, 1998 WL 664951, at *2 (N.D. Ill. Sept. 18, 1998) (statements introduced to show fact that statements were made and for the effect of statements on audience are not hearsay). Further, the email provides helpful color but is not material to the court's decision.

$300,000 transfer to defendant MK Fund, a $250,000 transfer to Hoppe in partial repayment of a loan, and a $60,000 transfer to Hoppe to reimburse him for certain expenses incurred in connection with IAM's operation of DMI.[14]  (Dkt. 177 at 4, ¶¶ 20-21; Dkt. 175 at 6, ¶ 22.)

Tahir expected to receive the car on or before August 17, 2009, but it was never delivered.  (Dkt. 170 at 5, ¶ 23; Dkt. 175 at 7, ¶ 23; Dkt. 177 at 4-5, ¶¶ 22-23.)  On September 29, 2009, Tahir made a formal written demand for the return of his payments to defendants.  (Dkt. 170 at 6, ¶ 28; Dkt. 175 at 8, ¶ 28.)  Two weeks later he filed this suit.

## ANALYSIS

### I. Breach of the Purchase Order

Tahir seeks summary judgment on his claim for breach of the Purchase Order by DMI, IAM, Hoppe and MK Fund.  The elements of a breach of contract claim under Illinois law[15] are "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff."  *Asset Exch. II, LLC* v. *First Choice Bank*, 953 N.E.2d 446, 455, 2011 IL App (1st) 103718, 352 Ill. Dec. 207 (2011).

The parties do not dispute the existence of a valid contract.  Further, Tahir concedes that DMI is the counterparty to the Purchase Order.[16]  (*See* dkt. 181 at 4 ("DMI contracted to sell Plaintiff the car.  IAM, the manager of the dealership with the authority over sales and purchase of inventory at the dealership, took Plaintiff's payment."); dkt. 176 at 5 ("Had Plaintiff been

---

[14] On September 9, 2009, IAM transferred an additional $100,000 to MK Fund.  (Dkt. 170 at 5, ¶ 22; Dkt. 175 at 6, ¶ 22.)

[15] The parties do not dispute that Illinois law governs the claims for breach of the Purchase Order.

[16] Although the DMI defendants may disagree with this fact, the court is addressing Tahir's motion for summary judgment, and Tahir had "no disagreement" with the Hoppe defendants' statement of fact that "[o]n August 4, 2009, Tahir entered into an agreement with DMI to purchase a 2008 Bentley Flying Spur."  (Dkt. 177 at 3, ¶ 13.)  Thus under Local Rule 56.1(b)(3)(C), this fact is deemed admitted for purposes of Tahir's motion for summary judgment.  *See* N.D. Ill. R. 56.1(b)(3)(A)-(C) ("All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party.").

7

aware that IAM was managing the dealership and was the only party with the ability to sell him the car, he would not have entered into a sales contract solely with 'Bentley Gold Coast' (the business name for defendant DMI)."); dkt. 177 at 3, ¶ 13.) The parties disagree about the agency relationship between DMI and IAM, and raise various other arguments that are addressed below.

A. DMI

1. DMI's Liability Under Agency Principles

Tahir argues both that IAM was acting as DMI's agent (dkt. 181 at 3-4) and that DMI was acting as IAM's agent (dkt. 163 at 5) in signing the Purchase Order. Under Illinois law, "[t]he test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc.* v. *Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (internal quotations and citations omitted). "Where the identity of the principal for whom an agent acts is sufficiently disclosed to a third party, then the principal and not the agent is liable on the contract." *Powers* v. *Warner Bros. Records, Inc.*, 411 F. Supp. 747, 748 (N.D. Ill. 1976); *see also Am. Design Group, Inc.* v. *Soft Sheen Prods., Inc.*, No. 95 C 3196, 1996 WL 41698, at *1 (N.D. Ill. Feb. 1, 1996) (absent proof of an "undisclosed principal" or an agent's agreement to personal liability, an agent generally is not liable for a principal's breach of contract). An agent who contracts on behalf of an *undisclosed* principal is personally liable on the contract because "the third party is obviously relying on the credit of the agent and not that of the principal." *Jameson Realty Group* v. *Kostiner*, 813 N.E.2d 1124, 1136, 351 Ill. App. 3d 416, 286 Ill. Dec. 431 (2004).

Although the Management Agreement explicitly provides that IAM acted as DMI's agent, parties' labels are not sufficient to establish an agency relationship. *Cf. EEOC* v. *Sidley*

8

*Austin Brown & Wood*, 315 F.3d 696, 709 (7th Cir. 2002) ("[E]mployer may not evade obligations under federal law by plastering the name "partner" on someone whose legal and economic characteristics are those of an employee.") (citing Restatement (Third) of Agency § 1.02 (2001) (parties' labels do not control)); *Chemtool*, 148 F.3d at 745 ("While an agency relationship can be created by contract . . . not all contracts create agency relationships . . . ."). The nature of the agency relationship between DMI and IAM, however, does not affect DMI's liability for breach of contract. If IAM was acting as DMI's agent, DMI is liable for breach of contract as a disclosed principal. If DMI was acting as IAM's agent, DMI is liable under the "undisclosed principal" doctrine. Tahir had purchased a car from Abbas in the past (Abbas Dep. 29:11-12), and he was not aware of the newly-formed relationship between DMI and IAM (dkt. 170 at 5, ¶ 19; dkt. 175 at 5, ¶ 19). The fact that IAM may have been the principal controlling sales behind the scenes does not alter the fact that Tahir entered into the contract in reliance on the DMI defendants' reputation and credit. Thus, DMI may be liable for breach of contract both if it was acting as an agent for IAM (under the undisclosed principal doctrine) and if it was acting as principal.

## 2. DMI's Defenses

The DMI defendants argue that DMI cannot be liable for breach of the Purchase Order because (1) Tahir did not perform on the Purchase Order (his money was sent to an account controlled by IAM rather than DMI[17]), and (2) DMI did everything within its power to deliver

---

[17] The portion of the Purchase Order provided to the court does not specify the account to which Tahir was supposed to wire his payment, but there is no allegation that Tahir wired the payments to the wrong account. The DMI defendants simply argue that Tahir paid IAM for the car and IAM stole the funds instead of buying the car. (Dkt. 169 at 4.) The fact that an intervening event interfered with DMI's recovering consideration for the Purchase Order is not the same as non-performance by Tahir and does not excuse DMI's performance. *See, e.g., OptionMonster Holdings, Inc.* v. *Tavant Techs., Inc.*, No. 10 C 2792, 2010 WL 2639809, at *3 (N.D. Ill. June 29, 2010) ("A plaintiff has substantially performed under a contract where the plaintiff has 'substantially complied with the material terms of the agreement

9

the car to Tahir. These arguments appear to invoke the related Illinois doctrines of impossibility of performance and commercial frustration.[18]

For an obligation to be "impossible" to fulfill, Illinois law requires that (1) the impossibility was not and could not have been anticipated by the parties; (2) the party asserting impossibility did not contribute to it; and (3) the party asserting impossibility demonstrates that it has tried all practical alternatives to permit performance. *See Caravette* v. *Z Trim Holdings, Inc.*, No. 2-11-0087, 2011 IL App (2d) 110087, at *11 (2011). To show commercial frustration, a party must prove that "(1) the frustrating event was not reasonably foreseeable; and (2) the value of counterperformance has been totally or nearly totally destroyed by the frustrating event." *Blue Cross Blue Shield of Tenn.* v. *BCS Ins. Co.*, 517 F. Supp. 2d 1050, 1059-60 (N.D. Ill. 2007) (citing *N. Ill. Gas Co.* v. *Energy Co-op., Inc.*, 461 N.E.2d 1049, 1059, 122 Ill. App. 3d 940, 78 Ill. Dec. 215 (1984)).

DMI does not succeed in demonstrating the elements of an impossibility or frustration defense. The apparent frustration or impossibility is IAM's failure to purchase the car from Luxury Motors O'Hare despite the fact that Tahir made full payment to IAM. This frustrating event was foreseeable when DMI entered into the Management Agreement with IAM. The Management Agreement provided that IAM would collect receipts and make payments as necessary to run DMI's business. (*See* Mgmt. Agmt., § 9.) DMI's inability to force IAM to perform according to the terms of their agreement is not an unforeseeable impossibility. *See Ner*

---

attributable to him.'") (quoting *Allsopp Sand & Gravel, Inc.* v. *Lincoln Sand & Gravel Co.*, 525 N.E.2d 1185, 1188, 171 Ill. App. 3d 532, 121 Ill. Dec. 878 (1988)).

[18] DMI failed to plead either impossibility or commercial frustration as affirmative defenses. Even though the court will address the substance of DMI's arguments, DMI's failure to plead generally amounts to waiver of the affirmative defenses. *See Radkiewicz* v. *Radkiewicz*, 818 N.E.2d 411, 418, 353 Ill. App. 3d 251, 288 Ill. Dec. 723 (2004) ("The affirmative defense of impossibility is well established in the common law of Illinois."); *Bank Leumi Le-Israel, B.M.* v. *Lee*, 928 F.2d 232, 235 (7th Cir. 1991) ("Failure to plead an affirmative defense results in a waiver of that defense.") (citations omitted).

*Tamid Congregation of N. Town* v. *Krivoruchko*, 638 F. Supp. 2d 913, 930 (N.D. Ill. 2009) (inability to cause a third party to perform is "ordinarily not to be regarded as an impossibility avoiding the obligation") (quoting *Hubbard* v. *Talbott Tavern, Inc.*, No. 2003-CA-001468, 2006 WL 2089308, at \*\*3-4 (Ky. Ct. App. July 28, 2006)). In fact, the Management Agreement specifically contemplates the possibility that either party could default. (*See* Mgmt. Agmt., § 13.) DMI also contributed to the frustration or impossibility by terminating the Management Agreement. Finally, DMI has not demonstrated that it was incapable of purchasing the car from the Luxury Motors O'Hare dealership itself and delivering it to Tahir, or otherwise making Tahir whole by repaying him in cash. Thus, neither the fact that Tahir paid IAM nor the fact that DMI attempted to force IAM to perform as required under the Management Agreement excuses DMI's performance under the Purchase Agreement. Tahir is entitled to summary judgment against DMI on his claim for breach of contract.

The court acknowledges that such a holding may appear unfair to DMI because it never received any money from Tahir. DMI, however, entered into a contractual arrangement with IAM that had attendant risks. One of those risks was that IAM would not fulfill its obligations under the Management Agreement. DMI cannot now use IAM's failure to perform as a defense to Tahir's claims, but DMI has recourse against IAM for breach of the Management Agreement. In fact, DMI has asserted such claims against IAM. (*See* dkt. 145 (DMI defendants' cross claims against IAM for breach of contract).)

### B. IAM, Hoppe, and MK Fund

IAM's liability for breach of the Purchase Order turns on whether DMI acted as IAM's agent in entering into the Purchase Order.[19] If IAM acted as an undisclosed principal, it may be liable for breach of contract. *See Vander Wagen Bros. Inc.* v. *Barnes*, 904 N.E.2d 663, 665, 15 Ill. App. 3d 550 (1973) (either agent or previously undisclosed principal may be liable for breach of contract).[20] It is unclear from the facts presented whether IAM had the right to control DMI's manner and method of work as is required to find a principal-agent relationship under Illinois law. Tahir and the DMI defendants contend that DMI had to obtain IAM's approval before purchasing or selling any cars, but the Hoppe defendants dispute this characterization and point to the terms of the Management Agreement, which are ambiguous. (*See* dkt. 175 at 6, ¶ 20.) Section 4 "authorizes" IAM to "supervise the sale and disposition of any new or used motor vehicles" but does not discuss whether IAM had the right to control all sales and dispositions or whether DMI could override IAM's decisions. (Mgmt. Agmt., at § 4.) Other provisions of the Management Agreement indicate that DMI may have been able to exercise some control over its operations. For example, section 3 of the Management Agreement allows IAM to discharge DMI employees, "subject only to the general supervision and control of the board of directors of [DMI]." (*Id.*, § 3.) Making all inferences in favor of IAM as the non-movant, the court cannot find that the Management Agreement provided IAM with the ability to control DMI as required

---

[19] Because DMI was a "disclosed" principal and there is no evidence that IAM agreed to personal liability for its actions as DMI's agent, IAM cannot be held liable if it was simply acting as agent for DMI. *See Am. Design Group*, 1996 WL 41698, at *1.

[20] Illinois courts have held that if a plaintiff succeeds in obtaining judgment against both an undisclosed principal and the agent, the plaintiff must elect which party to take judgment against. *See, e.g., Johnson* v. *Fischer*, 247 N.E.2d 805, 807, 108 Ill. App. 2d 433 (1969). As summary judgment only is being entered against DMI, this is not an issue at this stage in the case.

to find IAM acted as DMI's principal.[21] Thus, the court cannot grant summary judgment against IAM on Tahir's breach of contract claim.[22] The court also denies Tahir's motion for summary judgment against Hoppe and MK Fund because his claims against them are derivative of the claims against IAM.

## II. Prejudgment Interest

Tahir requests that the court include prejudgment interest in its judgment, citing the Illinois Interest Act, 815 Ill. Comp. Stat. 205/2, *et seq*. In diversity cases, "federal courts look to state law to determine the availability of (and rules for computing) prejudgment interest." *Medcom Holding Co.* v. *Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1405 (7th Cir. 1997) (quoting *Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1333 (7th Cir. 1992)). "The Illinois Interest Act provides for the award of interest when money is withheld by an unreasonable and vexatious delay of payment." *Cress* v. *Recreation Servs., Inc.*, 795 N.E.2d 817, 858-59, 341 Ill. App. 3d 149, 277 Ill. Dec. 149 (2003). An award of prejudgment interest may be made in the sound discretion of the trial court but, in order for interest to be awarded, the amount due to the plaintiff must be "a fixed and easily calculated amount due from a debtor-creditor relationship that has come into existence by virtue of a written instrument." *Id.* at 859; *see also Mutual Serv. Cas. Ins. Co.* v. *Elizabeth State Bank*, 265 F.3d 601, 629 (2001) (finding

---

[21] The court notes that additional facts may aid in determining IAM's ability to control DMI, including the provisions of the purchase agreement between DMI and I-Hopp dated March 18, 2009. The court has not been provided with a copy of the agreement and thus must infer that IAM's right to control DMI is restricted to the relationship as set forth in the Management Agreement.

[22] Although Tahir asserts a breach of contract claim against IAM, the underlying facts seem to point to the equitable theory of unjust enrichment. In *Raintree Homes, Inc.* v. *Village of Long Grove*, 807 N.E.2d 439, 445, 209 Ill. 2d 248, 282 Ill. Dec. 815 (2004), the Illinois Supreme Court found, "Here, plaintiffs have no substantive claim grounded in tort, contract, or statute; therefore the only substantive basis for the claim is restitution to prevent unjust enrichment." *Id.*; *see also Cleary* v. *Philip Morris Inc.*, 656 F.3d 511, 519 (7th Cir. 2011) (discussing unjust enrichment claim under Illinois law); *Shinmax* v. *Colovos*, No. 13 C 5430, 2014 WL 644568, at *2 (N.D. Ill. Feb. 19, 2014) (citing *Cleary* and allowing plaintiff to proceed with unjust enrichment claim). But because this claim has not been asserted by Tahir, the court is constrained to its analysis under Tahir's breach of contract claim.

contracts qualify as "written instruments" for the purpose of the Interest Act). The Interest Act specifies an interest rate of five percent per year for all moneys due under any written instrument. 815 Ill. Comp. Stat. 205/2. If a contract counterparty has failed to perform, prejudgment interest may be awarded in the amount paid for such performance. *See Ameritech Info. Sys., Inc.* v. *Bar Code Res., Inc.*, 331 F.3d 571, 574-75 (7th Cir. 2003) (affirming award of prejudgment interest on amount paid by plaintiff to defendant for services that were never performed).

In this case, an award of prejudgment interest at the rate of 5 percent per year on the $115,197 paid by Tahir is appropriate. Interest shall accrue from the date of Tahir's first written demand for payment on September 29, 2009 until the date of the judgment.

## III. Liability of Hoppe and MK Fund

The court need not address Tahir's motion for summary judgment against Hoppe and MK Fund because his claims against them are derivative of the claims against IAM and the court has denied summary judgment against IAM. Hoppe and MK Fund, however, separately move for summary judgment in their favor, arguing that there is no evidence to support a veil-piercing or alter ego claim to hold them liable even if IAM is found liable.[23]

Veil-piercing claims are governed by the law of the state of the corporation whose veil is sought to be pierced. *On Command Video Corp.* v. *Roti*, 705 F.3d 267, 272 (7th Cir. 2013). In this case, Tahir seeks to pierce the veil of IAM, an Illinois limited liability company, to hold Hoppe and MK Fund liable. Although IAM is not a corporation, similar veil-piercing standards

---

[23] While Hoppe is a member and manager of IAM, MK Fund is a separate Illinois limited liability company of which Hoppe also is both a member and manager. "[A]lthough usually it is the corporate veil between the parent corporation and its subsidiary that is pierced, courts may also pierce the corporate veil between two affiliated, or 'sister,' corporations." *Tower Investors, LLC* v. *111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 941, 371 Ill. App. 3d 1019, 308 Ill. Dec. 686 (2007) (citing *Main Bank of Chicago* v. *Baker*, 427 N.E.2d 94, 101, 86 Ill. 2d 188, 56 Ill. Dec. 14 (1981)).

apply to corporations and LLCs. *Id.* at 269; *see also Westmeyer* v. *Flynn*, 889 N.E.2d 671, 678, 382 Ill. App. 3d 952, 321 Ill. Dec. 406 (2008).

To pierce the corporate veil under Illinois law, a plaintiff must show "such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Sea-Land Servs., Inc.* v. *Pepper Source*, 993 F.2d 1309, 1311 (7th Cir. 1993) (internal quotation and citation omitted). "[T]he decision whether to disregard the corporate form to impose liability is fact intensive." *Laborers' Pension Fund* v. *Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009). To determine whether there is a unity of interest such that the corporate form should be disregarded, courts consider the following factors, among others: (1) inadequate capitalization; (2) insolvency of the debtor corporation; (3) failure to observe corporate formalities; (4) non-functioning of the other officers or directors; (5) absence of corporate records; (6) commingling of funds; (7) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (8) failure to maintain arm's length relationships among related entities; and (9) whether the corporation is a mere façade for the operation of the dominant shareholders. *See Gass* v. *Anna Hosp. Corp.*, 911 N.E.2d 1084, 1091, 392 Ill. App. 3d 179, 331 Ill. Dec. 854 (2009) (citation omitted). Further, "Illinois law endorses veil piercing to avoid unfair enrichment, permitting the creator of a liability and cause of the inability to meet that liability to escape responsibility[.]" *Wachovia Secs., LLC* v. *Banco Panamericano, Inc.*, 674 F.3d 743, 756 (7th Cir. 2012).

Tahir has provided the court with little information with respect to his veil-piercing claim.[24] The thrust of Tahir's case for veil-piercing is that Hoppe diverted funds from IAM to

---

[24] Tahir argues that it requested, but did not receive discovery on some of these issues. (*See* dkt. 176 at 4.) To the extent that Tahir is not able to support his case due to the Hoppe defendants' failure to

himself and MK Fund shortly after the Management Agreement terminated. Hoppe admits that these transfers were made but contends that they were made for valid consideration. Tahir has presented no evidence regarding IAM's capitalization or solvency but, making reasonable inferences in favor of Tahir, the court presumes that after Hoppe's purchase of DMI fell through, IAM no longer had any operational purpose and the subsequent transfers to pay off creditors likely depleted its account almost completely. Furthermore, it is clear that Tahir's payments unjustly enriched Hoppe and his companies and it may be improper to allow IAM's corporate form to shield them from liability. In light of these facts and inferences, the court finds there is a genuine issue of material fact with respect to whether IAM's corporate form should be disregarded. The court thus denies the Hoppe defendants' motion for summary judgment in favor of Hoppe and MK Fund.

## IV. IAM's Violation of the Consumer Fraud Act

The Hoppe defendants move for summary judgment in favor of IAM on Tahir's claim for violation of the Consumer Fraud Act. To succeed on a claim for deceptive practices under the Consumer Fraud Act, Tahir must show "(1) a deceptive act or practice by the defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) the occurrence of the deception in the course of conduct involving trade or commerce." *Zekman* v. *Direct Am. Marketers*, 695 N.E.2d 853, 860, 182 Ill. 2d 359, 231 Ill. Dec. 80 (1998).

Tahir's claim fails because he does not show that IAM intended that Tahir rely on any deceptive act in consummating his purchase of the car. Tahir does not point to any affirmative misrepresentation made by IAM. He argues that he was deceived because he was not aware of the Management Agreement and DMI's relationship with IAM. Tahir contends that had he

---

comply with discovery requests, this is an issue that should have been raised during discovery, which closed on March 6, 2013. Tahir did not file a motion to compel the Hoppe defendants to answer his discovery requests.

"been aware that IAM was managing the dealership and was the only party with the ability to sell him the car, he would not have entered into a sales contract solely with 'Bentley Gold Coast.'" (Dkt. 176 at 5.) There is no evidence, however, that IAM intended at the time of the transaction to take Tahir's money without delivering a car. The facts adduced by Tahir show instead that IAM intended to carry through with the sale of the car but failed to do so after the Management Agreement was terminated and the deal to purchase DMI fell through. *See Stern* v. *Great Western Bank*, 959 F. Supp. 478, 486 (N.D Ill. 1997) (finding second element of deceptive practices claim lacking where defendants did not intend that plaintiff rely on deceptive practice at time of contracting). As stated in this court's opinion on the motions to dismiss in this case, the circumstances of Tahir's "purchase" do not sound in fraud, but instead support his breach of contract claim. *Compare Gehrett* v. *Chrysler Corp.*, 882 N.E.2d 1102, 1115-16, 379 Ill. App. 3d 162, 317 Ill. Dec. 946 (2008) (finding cause of action under Consumer Fraud Act where plaintiff was induced to enter a contract by faulty representations of an automobile's features), *with Langendorf* v. *Conseco Senior Health Ins. Co.*, 590 F. Supp. 2d 1020, 1023-24 (N.D. Ill. 2008) (distinguishing *Gehrett* and dismissing deceptive practices claim where deceptive practice was the same conduct forming the basis for a breach of contract claim). Summary judgment is granted in IAM's favor on Count II.

## V.     Liability of Lamborghini Chicago

The Hoppe defendants move for summary judgment on all counts in favor of Lamborghini Chicago, arguing that its only involvement was the use of its credit card machine to process Tahir's $20,000 deposit, which was returned in full. Tahir does not respond to the motion and the court agrees with the Hoppe defendants that Tahir has made no showing that a claim for breach of contract or violation of the Consumer Fraud Act lies against Lamborghini Chicago.

17

With respect to Count I, it is undisputed that no contract exists between Lamborghini Chicago and Tahir, and there is no indication that there is an agency relationship between Lamborghini Chicago and either DMI or IAM. With respect to Count II, as discussed in the previous section, Tahir has not asserted any facts that indicate that any defendant intended to engage in deception at the time Tahir signed the Purchase Order. Summary judgment is thus granted in favor of Lamborghini Chicago on all counts.

## CONCLUSION AND ORDER

Based on the motions before it, the court enters judgment against defendant DMI for outstanding amounts due to Tahir plus prejudgment interest. The court notes, however, that DMI has filed cross claims against the Hoppe defendants who appear to be ultimately responsible for Tahir's repayment. The court strongly suggests that Mr. Abbas and Mr. Hoppe engage in serious discussions regarding repayment of the amounts owing to Mr. Tahir and settlement of the remaining issues in this case without further expense to themselves or burden on this court. The parties shall report for a status conference on April 22, 2014 at 11 a.m.

Tahir's motion for summary judgment on Count I (dkt. 162) is granted with respect to DMI, and denied with respect to IAM, Hoppe, and MK Fund. Judgment of $115,197, with interest accruing at 5 percent per year from September 29, 2009 is entered against DMI. The motion of Lamborghini Chicago, IAM, Hoppe, and MK Fund (dkt. 165) is granted in part and denied in part: Summary judgment is granted in favor of Lamborghini Chicago; denied with respect to Hoppe and MK Fund; and granted in favor of IAM on Count II.

Date: March 13, 2014

_____
U.S. District Judge Joan H. Lefkow

18